# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LON ADAMS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 13-140** |
| **STATE OF LOUISIANA** | **SECTION "A"(2)** |
| **ATTORNEY GENERAL** | |

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary.  See 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination.  Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, Lon Adams, was incarcerated in the B.B. "Sixty" Rayburn Correctional Facility in Angie, Louisiana, when this petition was filed by counsel.[2]  On January 8, 2009, Adams was indicted by a grand jury in Jefferson Parish for the second degree murder of his father, Leroy Adams Sr.  The Louisiana Fifth Circuit Court of Appeal summarized the facts of the case as follows:

> In 2005, like many homes in the Greater New Orleans area, Leroy Adams, Sr.'s house in New Orleans East was destroyed in the aftermath of Hurricane Katrina.  When Mr. Adams, who was 79 years old at that time, returned from evacuating the area, he moved in with his son, Lon, and his grandson, Chad, to Lon's house in Metairie.  Although Mr. Adams evacuated with both of his children and their families, he did not move in with his daughter, Lynn Landreneau, and her family when they returned because the Landreneaus were housing two other elderly relatives, who had been left homeless after the storm.
>
> In the Fall of 2005, as was their custom, Mr. Adams, Lon, and Chad joined the Landreneaus for family celebrations several times.  On December 25, 2005, Lon brought Mr. Adams and Chad to the Landreneau's house to celebrate the holiday.  Mrs. Landreneau recounted that, when her father first arrived with Lon, her father did not seem to recognize her but, after lunch, he seemed more like himself.  Several family members also recounted that Mr. Adams had lost a lot of weight in only a few months.  That day was the last time that Mrs. Landreneau saw her father alive.
>
> Mrs. Landreneau stated that, over the next several months, she called Lon's house many times trying to speak to her father, but she usually got the answering machine.  Mrs. Landreneau reported that, if Lon did answer the phone, he would not let her speak to their father.  She remembered Lon telling her either that their father was sleeping and did not want to be awakened, or that their father was angry with Lynn and did not want to speak with her.
>
> On July 26, 2006, Mrs. Landreneau contacted the Jefferson Parish Sheriff's Office ("JPSO") regarding her brother's refusal to allow her to communicate with their father.  Mrs. Landreneau stated that the deputy informed her that, without further indication of criminal activity, the Sheriff's Office would not investigate a family squabble.  She was warned that she could not enter Lon's house without his permission.

---

[2]Rec. Doc. No. 1, p. 10.

That day, Mrs. Landreneau and her husband went to Lon's house anyway, but Lon refused to let them inside. She remembered smelling a "horrible" odor, which was not a "Katrina" smell, from inside of Lon's house when he opened the door. However, immediately after opening the door, Lon exited the house, slamming the front door to her and her husband.

Lon went straight to his vehicle but, before he left, Lon told Lynn Landreneau that he had put their father into a nearby nursing home in Metairie. That day, when the Landreneaus went to that particular nursing home to confirm Mr. Adams('s) presence, the staff found no record that Mr. Adams had been placed into their care.

In November of 2006, Lynn called Lon to invite him, her father, and nephew to celebrate Thanksgiving with her family. Lon accepted for himself and his son but explained that their father would only come to dinner on the condition that Lynn agreed not to talk to him because he was still not speaking to her. Lynn refused to agree, which, she remembered made Lon seem relieved. That year, Lon and Chad came to Thanksgiving dinner without Mr. Adams.

Over the next eighteen months, Lon and Chad went to the Landreneaus' house for family functions without Mr. Adams, claiming that Mr. Adams refused to attend because he was still not speaking to Lynn. During that same time frame, Lynn Landreneau filed a complaint with Elderly Protective Services, a service of the Louisiana Governor's Office of Elderly Affairs. Further, during that time frame, Mrs. Landreneau noticed that there were monthly deposits from Social Security and other sources into Mr. Adams bank account, but only one withdrawal - a check to Lon Adams.

On the afternoon of June 2, 2008, Mrs. Landreneau went to the Jefferson Parish Sheriff's Office in Metairie to again try to report her father as missing. Within the hour, Jefferson Parish Sheriff's Officer Joseph Ventola went to Lon's residence. Lon refused to admit Officer Ventola into his house stating that his father was sleeping and the house was messy. Officer Ventola told Lon that the investigation into his father's alleged disappearance was "not going away."

The next morning, Sergeant Lisa Lunsford contacted local hospitals, nursing homes, and correctional facilities in an attempt to ascertain Mr. Adams' whereabouts. When her search was unsuccessful, Sergeant Lunsford notified her supervisor, Captain Hilda Montecino, that JPSO needed to determine whether Mr. Adams was in the residence.

Sergeant Lunsford and Captain Montecino went to the residence and knocked on the door, but there was no response. The officers decided to maintain surveillance on the house.

A little while later, the officers observed a vehicle matching the description of Lon's vehicle turn onto Lon's street. After turning onto the street, however, the driver drove past Lon's house without stopping. Deputy David Randall and Detective Todd Giacona immediately conducted a traffic stop and removed Lon and Chad from the vehicle. Officer Randall advised Lon of his rights and asked for consent to search his residence. As Captain Montecino was filling out the consent

3

to search form, she got a call from another officer informing her that a judge had signed a warrant allowing JPSO to search the house.

Immediately, Detective Giacona entered the house.  Deputy Randall stood outside for officer safety with Captain Montecino and Lon, while Detective Giacona went inside.  When Detective Giacona went to the second floor of the house, he observed three rooms at the top of the stairwell - a bedroom to the left, a bathroom in front, and another bedroom to the right, later identified as Chad's bedroom.  To Detective Giacona, it appeared that the entire second floor area had suffered water incursion as a result of roof damage.  Although the entire second floor smelled like mildew, a "really disgusting smell" came from the left bedroom.

Detective Giacona, using his shoulder, forced the door to the left bedroom open about a foot and found debris behind it.  It was dark inside and the windows were closed.  Using his flashlight, he was able to see skeletal remains on top of the bed.  The remains were later identified as those of Leroy Adams, Sr.

As Detective Giacona descended the stairs from the second floor, Lon asked about his father.  When Detective Giacona told him that his father was dead, Lon did not react emotionally to the news.

JPSO deputies then transported Lon to the investigations bureau where he was again advised of his constitutional rights.  Lon waived his rights then gave a statement to Lieutenant Donald Meunier.  In that statement, which was played for the jury at trial, Lon said that the last time he entered his father's bedroom was in 2006, and that he did not know when his father had died.  Lon claimed neither he nor anyone else ever physically abused or harmed his father.  He could not explain why he did not go into the room after that time, and he believed that the examination of the remains would show that his father died of old age.

After giving the statement, Detectives Roger Gorumba and Keith Locascio transported Lon to West Jefferson Medical Center so he could undergo a psychological evaluation.  Lon stayed there for nine days - from June 3 to June 12, 2008.  During that nine-day period, Lieutenant Meunier received preliminary findings regarding the skeletal remains, which showed that the victim sustained substantial bone damage, including 24 rib fractures some of which severed the rib from the spine, multiple fractures of the hyoid bone caused by apparent squeezing of the neck, a fractured toe, and a fractured finger.

On June 12, 2008, Lieutenant Meunier learned from the Jefferson Parish Coroner's office that Lon was going to be released from the hospital at approximately 1:00 p.m.  After obtaining that information, he and Detective Locascio went to West Jefferson Medical Center.  When they saw defendant leaving, Lieutenant Meunier approached him to ask if he would come to the JPSO Detective Bureau for additional questions.  Lieutenant Meunier testified that Lon willingly agreed.  Lieutenant Meunier and Detective Locascio transported Lon to the detective bureau where they again advised Lon of his rights.  Lon gave four more statements that day.

In his first statement on June 12, 2008 at 1:28 p.m., Lieutenant Meunier told Lon that the preliminary medical findings suggested that his father died as a result of trauma.  When asked about his father's injuries, Lon recalled that, in late 2005 or early 2006, his father fell out of bed onto an army footlocker and injured his ear.  Lon also recalled that his father fell down the stairs twice, but was not injured.  Lon denied hurting his father and maintained that any trauma would have been from one of the falls that his father had taken.  Finally, he indicated that he might have been concerned about reporting his father's death because he felt as if he did not adequately care for his father.

In his second statement on June 12, 2008 at 2:14 p.m., Lieutenant Meunier asked Lon if he had told his son, Chad, not to say certain things to the police that might get Lon into trouble.  Lon explained that he was concerned that Chad, who is developmentally disabled, might report that Lon and his father argued.

Lon thought his father was alive in the first quarter of 2006, but not after that.  Lon agreed that he might not have cared for his father as well as he should have.  Lon admitted that it was possible that his father died from starvation.  He claimed that he concealed his father's death because he was embarrassed and ashamed that he had allowed his father to die "on his watch."

In his third statement on June 12, 2008 at 4:55 p.m., Lieutenant Meunier asked Lon for more specific information about his father's injuries.  Lon said that, when his father urinated on the bathroom floor, the floor became slippery, which caused his father to fall.  After a fall, Lon would have to help his father up from the floor.  Lon explained that he would lift his father up with one hand underneath his father's arm and one underneath his neck.  Lon asserted that his father's neck could have been injured when Lon picked him up.

Lon also stated that his father frequently fell out of bed.  Lon said that the last time he helped his father back into bed was during the first quarter of 2006.  He stated that the last time he put his father into bed, his father was conscious.  Lon denied hitting his father but admitted that he may have pushed his father down onto the bed.  He said that his father could have been injured by falling out of his bed onto a footlocker, which was about 18 inches from the side of the bed.  He also conceded that he probably did not sufficiently attend to his father's nutrition or supervision.

In his fourth and last statement of June 3, 2008, which was given at 8:52 p.m., Lon remembered the event that could have caused his father's injuries.  He recounted that, one night in the second quarter of 2006, he heard a thump and thought his father probably had fallen out of bed.  Lon went into the bedroom to pick up his father, who was very difficult to lift.  He picked his father up by putting both hands underneath him and "almost throwing" him into bed.  Lon lost his balance and fell on top of his father.  He thinks his right forearm landed across his father's throat.  Mr. Adams cried out in a small gasp of pain; however, his father was still conscious.  Lon said the pain would have been pretty severe, but his father did not say anything.  His father curled up like he always did, and Lon either covered his father or his father covered himself.

5

After that incident, Leroy Adams never exited the room, and Lon never went back in again.  Before that incident, his father used to come downstairs to eat, but after that incident, he did not.  Lon knew after a while that his father was dead, but it was difficult for him to admit it, especially since he had accidentally hurt his father "that bad."

After Lon gave his statements, Lieutenant Meunier drove him back to his house.  The officers did not arrest Lon at that point because his father's death had not yet been ruled a homicide.  Specifically, the medical examiner had not yet rendered her report declaring the manner and cause of the victim's death.

Mary Manhein, an expert forensic anthropologist, testified that she and her assistants recovered the skeletal remains from the defendant's house.  Dr. Manhein opined that the victim died between six months to three years before the remains were discovered.  Dr. Manhein noted that the remains revealed, among other things, evidence of perimortem trauma, which is trauma that happened at or around the time of death.

Dr. Manhein testified that the victim sustained multiple perimortem bone fractures: two of the hyoid bone; two of the ossified thyroid cartilage; two fingers of the left hand; thirteen on the left ribs, eleven on the right ribs; one of the eleventh thoracic vertebrae and one of the right big toe.  Dr. Manhein opined that the perimortem trauma was likely caused by a direct blunt force trauma inflicted in one or more events.  She said that, in order for the hyoid to break, it would have been subjected to squeezing or pressure from side-to-side.  She also said that the thyroid cartilage could have been broken by blunt force, which could have occurred if the area was hit from the front.

Dr. Manhein asserted that considerable force was required to inflict such a wide scale pattern of damage to the back and front of the body.  Dr. Manhein testified that she had only seen this type of widespread trauma one other time, in a person who was most likely run over by a car.  Dr. Manhein testified that the damage shown in the skeletal remains was not sustained as the result of the victim falling from the bed onto the footlocker because the height was not great enough.

Dr. Karen Ross, an expert forensic pathologist employed as Assistant Coroner for the Jefferson Parish Coroner's Office, also examined the remains to determine manner and cause of death.  She testified that the manner of death was homicide and the cause of death "most likely was intentionally inflicted blunt force injuries."  Dr. Ross relied heavily upon the anthropologic exam in forming her opinion.

Dr. Ross explained that the injury to the victim's hyoid bone was more consistent with pressure being applied by a hand or a finger, rather than a fall.  Further, the victim's neck injuries could also have been caused by blunt force trauma, i.e., a direct blow to the neck.  She stated that the types of injuries sustained by the victim were the result of high-impact force seen in motor vehicle or industrial accidents.

6

Dr. Ross testified that, given the extent of bone damage present in this victim, he would have likely experienced bruising and/or hemorrhage in the lungs; "likely tears of the pleura with pneumothorax;" blood and air collecting in the chest; and bleeding from the arteries, which would have been fatal. Dr. Ross stated that, in her opinion, the victim's death would have been painful and not instantaneous. Dr. Ross testified that, if the victim had been brought to the hospital after sustaining the injuries, it is possible that he would have survived.

Dr. Ross testified that it was not possible, in her opinion, that the victim sustained the distinct injuries by falling out of bed onto a footlocker. Dr. Ross disagreed that all 29 rib fractures occurred at the same time because only 24 of the fractures were perimortem, i.e., at or near the time of death.

Additionally, Dr. Ross noted that the victim's skeleton did not exhibit signs of significant osteoporosis. Further, the most common injuries to osteoporosis sufferers were head injuries and hip fractures, which the victim did not have.

Chad Adams, defendant's son, testified [that], in late 2005 or early 2006, he saw his grandfather fall down the stairs once. He also testified that, around that same time, defendant told him that his grandfather fell again and was injured. After the second fall, defendant told Chad that his grandfather was in the hospital. Chad testified that, whenever he asked defendant where his grandfather was, defendant told him that his grandfather was sick in the hospital.

Chad could not remember the last time that he saw his grandfather alive. Chad stated that he did not know his grandfather was hurt in the bedroom and did not know his grandfather was dead before the skeletal remains were found. Chad remembered smelling a weird smell in the house, but he thought it was dead rats or mice.

Chad remembered telling his cousin on Christmas Day in 2005 that their grandfather sometimes beat on the walls of his bedroom with a cane and screamed for food and water, which was "driving him crazy." Chad testified that, when his grandfather did that, he and defendant would bring his grandfather food and water. He stated that neither he nor defendant ever hit his grandfather.

Salvadore Brocato, defendant's next door neighbor, testified that in mid to late 2006, he and his wife noticed flies in the top left window on the second floor of defendant's home. He thought that the flies were attracted to a dead animal in the second floor area because the roof was damaged and that area of the house was exposed. He never saw anyone, other than Chad and defendant, going into the house.

The defense presented testimony from Dr. Charles Cefalu, an expert in the fields of geriatrics, elder abuse, and osteoporosis, who reviewed the reports of Drs. Ross and Manhein, defendant's statements, and the victim's Methodist Hospital medical records. Dr. Cefalu stated that Mr. Adams was an 80-year-old man who was relatively immobile, diabetic, suffering with chronic lung disease, increased risk of osteoporosis, and Alzheimer's disease. In his opinion, if the victim had rolled off of his bed and hit the edge of a wooden box, i.e. the footlocker, he could have suffered

7

the injuries present at the time of death.  Dr. Cefalu opined that the victim's injuries were probably caused in this way.

Dr. Cefalu testified that Mr. Adams' injuries were consistent with a one-impact injury because the injury was linear.  He did not think defendant stumbling and falling onto his father was the cause of death.  Based on Mr. Adams' neck injuries, Dr. Cefalu thought there was a pretty significant chance that Mr. Adams had suffered an acute airway obstruction, which could lead to death within minutes if not resolved.  He testified that it would take minimal trauma in an individual with severe osteoporosis, like Mr. Adams, to cause the injuries seen in the skeletal remains.

On cross-examination, Dr. Cefalu admitted that his opinion that Mr. Adams suffered with Alzheimer's disease was based on testimony that Mr. Adams failed to recognize his daughter on Christmas Day of 2005.  Dr. Cefalu also stated that his opinion that Mr. Adams experienced chronic lung disease and osteoporosis was based on risk factors, not medical records.  He did not remember seeing the question marks after the word "diabetes" in the victim's medical records.

The defense also presented testimony from Dr. Jaime Garza, an expert in the fields of head and neck trauma, airway management, and reconstructive surgery, whose opinion was developed from reviewing the reports of Drs. Ross and Manhein. Dr. Garza testified that falling out of bed and landing on the corner of the footlocker could have caused the injury to Mr. Adams' hyoid bone and cartilage, and if that occurred, it was very likely Mr. Adams' airway would have been compromised.  He said the victim would have thrashed for about 90 seconds trying to get oxygen then suffered brain death after about eight minutes.  Dr. Garza disagreed with the police and the medical experts who said there was no other reasonable scenario to explain Mr. Adams' injuries other than homicide.

Dr. Garza said the gasp that the defendant heard after he fell on his father made sense because often a person on the verge of dying releases such a sound.  He did not think calling 911 would have saved Mr. Adams' life, because it would have been too late.  He expected that an 80-year-old man with Alzheimer's and who smoked, as Mr. Adams did, to have osteoporosis.

Defendant testified, on his own behalf, that his father's health deteriorated rapidly after Hurricane Katrina.  In fact, defendant retired in November of 2005 to eliminate "job stress" and to care for his father.  Defendant maintained that his father fell down the stairs twice, but was not injured and did not want to go to the doctor. Defendant stated that his father fell in his bedroom two or three times a week.

Generally, he would find his father on the floor on the side of the bed, either the left or the right side.  Defendant knew his father had fallen before on the footlocker when he fell out of bed.  He last saw his father alive in the spring of 2006. Defendant was asleep on the sofa downstairs when he heard a loud noise he had heard several times before, and he assumed his father had fallen out of the bed. Defendant went upstairs and found his father on the floor on the side of the bed.  He lifted his father to put him on the bed.

8

Defendant guessed he hit the side of the bed which caused him to drop his father on the bed and then fall across his father with his forearms.  He heard a gasp or small cry and could tell his father was in pain.  Defendant testified that it then became apparent to him that his father was not breathing, and he realized his father had passed away.  He thought he might have accidentally hurt his father and caused his death.  He did not call 911 because he could not admit it to himself or anyone else that he might have accidentally killed his father.

State v. Adams, 78 So.3d 222, 225-231 (La. App. 5th Cir. 2011); State Record Volume 8 of 14, Louisiana Fifth Circuit Court of Appeal Opinion, 10-KA-855, p. 2-14, November 15, 2011.

Adams was tried before a jury on September 21 through 25, 2009, and was found guilty of the lesser offense of manslaughter.[3]  The state trial court denied Adams's motions for a new trial and post-verdict judgment of acquittal at a hearing held on December 7, 2009.[4]  The court sentenced Adams on December 11, 2009, to serve twenty

---

[3]St. Rec. Vol. 1 of 14, Trial Minutes, 9/21/09; Trial Minutes, 9/22/09; Trial Minutes, 9/23/09; Trial Minutes, 9/24/09; Trial Minutes, 9/25/09; Jury Verdict, 9/25/09; St. Rec. Vol. 2 of 14, Transcript of Salvador Brocato's Cross Examination, 9/22/09; Transcript of Donald Meunier's Direct Examination, 9/23/09; Transcript of Karen Ross's Direct Examination, 9/23/09; Transcript of Mary Manhein's Direct Examination, 9/23/09; Transcript of Donald Meunier's Direct Examination, 9/24/09; Transcript of Dr. Cefalu's Qualifications, 9/24/09; Transcript of Donald Meunier's Cross Examination, 9/24/09; St. Rec. Vol. 4 of 14, Trial Transcript, 9/22/09; St. Rec. Vol. 5 of 14, Trial Transcript (cont.), 9/22/09; Trial Transcript, 9/23/09; Trial Transcript, 9/24/09; St. Rec. Vol. 6 of 14, Trial Transcript (cont.), 9/24/09; Trial Transcript, 9/25/09.

[4]St. Rec. Vol. 1 of 14, Motion for New Trial, 10/1/09; Motion for Post-Verdict Judgment of Acquittal, 12/3/09; Motion for New Trial, 12/4/09; St. Rec. Vol. 3 of 14, Hearing Transcript, 12/7/09.

(20) years in prison at hard labor.[5]  The court later denied Adams's motion to reconsider the sentence on January 12, 2010.[6]

Adams's conviction and sentence were affirmed on direct appeal by the Louisiana Fifth Circuit on November 15, 2011.[7]  The court refused Adams's rehearing request on January 24, 2012.[8]  The Louisiana Supreme Court denied Adams's subsequent writ application without reasons on June 1, 2012.[9]

Adams's conviction became final 90 days later, on August 30, 2012, when he did not file a writ application with the United States Supreme Court.  Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)), cert. denied, 529 U.S. 1099 (2000); U.S. Sup. Ct. Rule 13(1).

_____

[5]St. Rec. Vol. 1 of 14, Sentencing Minutes, 12/11/09; St. Rec. Vol. 3 of 14, Sentencing Transcript, pp. 5-6, 12/11/09; Supplemental Sentencing Transcript, 12/11/09.

[6]St. Rec. Vol. 1 of 14, Motion to Reconsider Sentence, 1/4/10; Trial Court Order, 1/12/10.

[7]State v. Adams, 78 So.3d at 222; St. Rec. Vol. 8 of 14, 5th Cir. Opinion, 10-KA-855, 11/15/11.

[8]St. Rec. Vol. 3 of 14, 5th Cir. Ruling, 10-KA-855, 1/24/12.

[9]State v. Adams, 90 So.3d 434 (La. 2012); St. Rec. Vol. 14 of 14, La. S. Ct. Order, 2012-K-0434, 6/1/12; La. S. Ct. Writ Application, 12-K-434, 2/23/12.

II.     FEDERAL HABEAS PETITION

On January 25, 2013, Adams's counsel filed this petition for federal habeas corpus relief in which he asserted the following grounds for relief:[10] (1) He is in custody in violation of the Fourth Amendment because there was no probable cause for his arrests on June 3 or June 12, 2008. (2) The Louisiana Fifth Circuit erred on direct appeal in failing to address his Fourth Amendment claim, imposing a procedural bar to its review, and affirming his conviction based on the illegally obtained inculpatory statements. (3) The State failed to present sufficient evidence to support the manslaughter verdict. (4) His sentence was unconstitutionally excessive, and the appellate court erred in upholding the sentence after it concluded that the victim's injuries were the result of an accident.

The State filed a response in opposition to Adams's petition, conceding timeliness and exhaustion.[11] The State argues that Adams's first and second claims are barred from federal review and are otherwise in procedural default. The State further argues that the Adams's third and fourth claims are without merit.

Adams replied to the State's response, arguing that the state courts erred in imposing the procedural bar to his Fourth Amendment claim and that the claim is not

---

[10]Rec. Doc. No. 1.

[11]Rec. Doc. No. 13.

barred from federal review since it was not addressed on the merits by the state courts.[12]
Adams also re-urges his arguments in connection with the insufficient evidence claim.

III.    GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") went into effect on April 24, 1996[13] and applies to habeas petitions filed after that date.  Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).  The AEDPA therefore applies to Adams's petition filed by counsel on January 25, 2013.

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).  The State concedes and I find that Adams's petition was timely filed and he has exhausted available state court remedies. The State argues that two of Adams's claims are in procedural default and are otherwise barred from federal review.

---

[12]Rec. Doc. No. 18.

[13]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

IV.    FOURTH AMENDMENT CLAIMS NOS. 1 AND 2

Adams alleges that his Fourth Amendment rights were violated when he was arrested twice without probable cause, which tainted his inculpatory statements made after the arrests.  He also argues that the Louisiana Fifth Circuit erred on direct appeal when the court failed to address his Fourth Amendment claim, and instead imposed a procedural bar to its review, and then affirmed the conviction based on the inculpatory statements obtained during his illegal arrest.  Adams's claim that his statements should have been suppressed because they followed illegal arrests arises under the Fourth Amendment.  Dunaway v. New York, 442 U.S. 200 (1979); Jones v. Johnson, 171 F.3d 270, 277-78 (5th Cir.1999).

The state court record reflects that Adams filed a pretrial motion to suppress his confessions and inculpatory statements, arguing that he was not read his Miranda rights and that he was in shock and unable to understand the consequences of his statements.[14] He also argued that, before the statements could be used against him, the State had to prove that they were made knowingly and voluntarily and that any information from a confidential informant was reliable, without which the arrest was made without probable cause.  At the hearing on the motion, Adams's counsel focused his questioning and argument on the voluntariness of the statements based on the presence of sheriff's

---

[14]St. Rec. Vol. 1 of 14, Motion to Suppress Confession, 3/5/09.

13

deputies as Adams was released from observation at the hospital.[15]  The state trial court

denied the motion, finding that the statements were knowingly and voluntarily made.

Later, in the motion for new trial filed on December 4, 2009, Adams argued that

he was technically under arrest on June 3 and 12, 2008, when he made inculpatory

statements to sheriff's deputies, and that there was no probable cause for his arrest on

those dates.[16]  During the hearing on the motion, the state trial court questioned whether

the motion for new trial sought to have the court reverse itself or implied that the court

was wrong to deny the pretrial motion to suppress.[17]  In response, Adams's counsel made

the following statement:[18]

> Well, Your Honor, you know that, I don't know that I have to go - -
> Well, wrong in this respect, Your Honor, the March 27th motion to
> suppress as I read it had to do with Miranda and the Fifth Amendment, and
> as the law is set out in the brief, as you've seen shows that the Fifth
> Amendment is a totally different aspect of - - as far as statements taken
> from a witness than the Fourth Amendment, okay.
>
> The Fourth Amendment is the arrest.  That wasn't really addressed
> at that time.  Statements made at the trial, some statements made at the
> motion to suppress, if you put it all together shows a Fourth Amendment
> violation.  There was an illegal arrest made without probable cause.  It was
> exploited, and that was not specifically ruled on by this Court.

---

[15]St. Rec. Vol. 2 of 14, Hearing Transcript, pp. 40-43, 3/27/09.

[16]St. Rec. Vol. 1 of 14, Motion for New Trial, 12/4/09.  Adams's counsel filed another motion
for new trial on October 1, 2009, simply stating that the findings at trial did not comport with the law and
evidence.  St. Rec. Vol. 1 of 14, Motion for New Trial, 10/1/09.

[17]St. Rec. Vol. 7 of 14, Hearing Transcript, pp. 19-20, 12/7/09.

[18]Id., pp. 20-21.

What this Court ruled on was well, he got his <u>Miranda</u> rights.  That's true. . . .

That's the error, to the extent that the Court denied the motion to suppress, it didn't look at the Fourth Amendment, okay, for whatever reason, and this is what this is about, the Fourth Amendment, the arrest, the probable cause and exploitation of an illegal arrest.

The state trial court denied the motion without stated reasons at the close of the hearing.[19]

On direct appeal, Adams asserted six (6) assignments of error, including two (2) in which he argued that the state trial court erred in (a) denying the motion to suppress on grounds that the inculpatory statements were obtained in violation of the Fourth Amendment and (b) allowing the statements into evidence at trial.[20]  The Louisiana Fifth Circuit found that the Fourth Amendment issue was not preserved for appeal.  The appellate court determined from the record that the issue was not raised in the pretrial motion to suppress or argued at the hearing on that motion.  Because the issue was not properly raised in or addressed by the trial court, the appellate court was precluded from addressing the issue on appeal pursuant to La. App. Rule 1-3.  This was the last reasoned opinion on the issue by a state court.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 802 (1991).

---

[19]<u>Id.</u>, p. 22.

[20]St. Rec. Vol. 3 of 14, Appeal Brief, 10-KA-855, 11/17/10; <u>State v. Adams</u>, 78 So.3d at 231-32; St. Rec. Vol. 8 of 14, 5th Cir. Opinion, 10-KA-855, p. 14, 11/15/11.  Adams also asserted that the evidence was insufficient to support the verdict, the trial court erred in denying the motion for post-verdict judgment of acquittal and the sentence was excessive.

Adams's Fourth Amendment claim has now been presented to this federal court. He seeks review of the merits of his claim based on his assertion that the Louisiana Fifth Circuit erred under state law in finding that the claim was not preserved for appellate review and by imposing a state procedural bar to his claim on direct appeal.  Federal law is well settled that claims of error in the application of state law do not assert a claim cognizable in federal habeas proceedings.  Swarthout v. Cooke, __ U.S. __, 131 S. Ct. 859, 861 (2011) (federal habeas review does not lie for errors of state law) (quoting Estelle v. McGuire, 502 U.S. 62, 67 (1991)); Engle v. Isaac, 456 U.S. 107, 119 ("Insofar as respondents simply challenge ... [the application of state] law, they allege no deprivation of federal rights and may not obtain habeas relief." (emphasis added)); Young v. Dretke, 356 F.3d 616, 628 (5th Cir. 2004).  In the course of reviewing state criminal proceedings, a federal court does "not sit as a super state supreme court to review error under state law."  Wood v. Quarterman, 503 F.3d 408, 414 (5th Cir. 2007); Skillern v. Estelle, 720 F.2d 839, 852 (5th Cir. 1983).  Adams's arguments regarding the Louisiana Fifth Circuit's alleged misinterpretation of state law regarding preservation of claims for appeal, which led to the application of the procedural bar to his claim, is not reviewable by this federal court.

Notwithstanding any error in interpretation of state law or application of a state procedural bar, this federal court's review of Adams's Fourth Amendment claim is

limited by the Supreme Court's long-standing prohibition in Stone v. Powell, 428 U.S.

465 (1976).  In Stone, the Supreme Court held that "where the State has provided an

opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may

not be granted federal habeas corpus relief on the ground that evidence obtained in an

unconstitutional search or seizure was introduced at trial." (footnotes omitted) Id., at 494.

The "full and fair" hearing contemplated by Stone refers to thoughtful consideration by

the factfinder and at least the availability of meaningful appellate review by a higher state

court.  Davis v. Blackburn, 803 F.2d 807, 808 (5th Cir.1986); O'Berry v. Wainwright,

546 F.2d 1204, 1213 (5th Cir. 1977).

    The United States Fifth Circuit Court of Appeals has interpreted an "opportunity

for full and fair litigation" to mean just that, "an opportunity."  Caver v. Alabama, 577

F.2d 1188, 1192 (5th Cir. 1978); Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002),

cert. denied, 537 U.S. 1196 (2003).  "If a state provides the processes whereby a

defendant can obtain full and fair litigation of a fourth amendment claim, Stone bars

federal habeas corpus consideration of that claim whether or not the defendant employs

those processes."  Caver, 577 F.2d at 1192.  "[I]t is the existence of state processes

allowing an opportunity for full and fair litigation of fourth amendment claims, rather

than a defendant's use of those processes, that serves the policies underlying the

exclusionary rule and bars federal habeas corpus consideration of claims under <u>Stone</u>."
<u>Williams v. Brown</u>, 609 F.2d 216, 220 (5th Cir. 1980).

Thus, it is the <u>opportunity</u> to present a Fourth Amendment claim to the state courts
that is the basis of the <u>Stone</u> prohibition, without regard for whether that opportunity is
actually exercised or is unsuccessful.   <u>Janecka</u>, 301 F.3d at 320-21.   Even when a
defendant fails to take advantage of the opportunity to litigate a motion to suppress or
assert Fourth Amendment claims, the fact that the opportunity existed suffices for the
<u>Stone</u> bar to apply.   <u>Id</u>. at 320.

The United States Fifth Circuit has also held that the <u>Stone</u> bar applies even in the
face of <u>error</u> by the state court in deciding the merits of the Fourth Amendment claim.
<u>Swicegood v. Alabama</u>, 577 F.2d 1322, 1324-1325 (5th Cir. 1978); <u>Woodard v. Thaler</u>,
702 F. Supp.2d 738, 759-60 (S.D. Tex. 2010) ("Even if the state court improperly applied
its own procedural law in refusing to consider Woodard's Fourth Amendment argument,"
the <u>Stone</u> bar still applied.) (citing <u>Moreno v. Dretke</u>, 450 F.3d 158, 167 (5th Cir. 2006)).
Likewise, even when the state courts <u>err</u> in the disposition of the Fourth Amendment
claim <u>on procedural grounds</u>, the <u>Stone</u> bar still applies "with equal force."  <u>Williams</u>,
609 F.2d at 219-20.

> [I]n the absence of allegations that the processes provided by a state to fully
> and fairly litigate fourth amendment claims are routinely or systematically
> applied in such a way to prevent the actual litigation of fourth amendment
> claims on the merits, the rationale of <u>Caver</u> dictates that <u>Swicegood</u>'s

application of <u>Stone</u> despite a mistake in adjudicating the merits must apply with equal force to procedural mistakes that thwart the presentation of fourth amendment claims.

<u>Williams</u>, 609 F.2d at 220; <u>Janecka</u>, 301 F.3d at 321.

Thus, to obtain post-conviction relief in federal court, a habeas petitioner must plead and prove that the state court process or proceeding was inadequate.  <u>Davis</u>, 803 F.2d at 1372.  Adams has not met this burden.   He does not allege or demonstrate that Louisiana state courts routinely or systematically preclude litigation of a defendant's Fourth Amendment claims.   On the contrary, he recognizes the many opportunities available for review of such claims in the Louisiana courts.   In addition, this court has found that "[i]t is beyond cavil that Louisiana courts provide criminal defendants the opportunity to raise Fourth Amendment claims."  <u>Bailey v. Cain</u>, No. 06-839, 2007 WL 1198911, at *13 (E.D. La. Apr. 20, 2007) ( Duval, J.) (order adopting referenced Report and Recommendation).

The record demonstrates that Adams had multiple opportunities to litigate his Fourth Amendment claim of unlawful arrests to challenge the use of his own statements.  First, Adams filed an unsuccessful motion to suppress the confession and inculpatory statements.  The Louisiana Fifth Circuit later found that he failed to include <u>this</u> Fourth Amendment claim concerning his allegedly unlawful arrests in the motion.  This fact was conceded by his counsel during oral argument on the motion for new trial in which his

19

counsel stated, as quoted above, that the pretrial motion was based on the Fifth Amendment and that the Fourth Amendment issue was <u>not</u> addressed.[21]  Adams at trial did not object again to the admissibility of the statements into evidence or argue false arrest or lack of probable cause.

I note that Adams's pretrial motion to suppress includes a cursory statement that the arrest was not supported by probable cause and the statements should be suppressed for that reason.  Adams, however, offered the state trial court no basis or factual support for this conjecture. On appellate review, the Louisiana Fifth Circuit confirmed that Adams's blanket statement in the pretrial motion was insufficient to preserve the claim, since it was not linked to any particular fact or allegation in the motion to suppress.  For that reason, his appeal of the issue was met with the procedural bar.  Adams nevertheless re-urged the appellate court to review his claim on reconsideration of the appeal, which also was refused.  This again is a matter of <u>state law</u> interpretation that is not reviewable in a federal habeas proceeding.

Despite of the state appellate court's rulings, Adams was able to present his Fourth Amendment claim to the Louisiana Supreme Court, including his argument that the appellate court erred in failing to consider the merits of his claim.  While the Louisiana

---

[21]St. Rec. Vol. 7 of 14, Hearing Transcript, pp. 20-21, 12/7/09.

Supreme Court denied his application without stated reasons, he was not deprived of the opportunity to present the issue to the state's high court.

The record therefore establishes that the Louisiana courts provided several opportunities for Adams to urge his Fourth Amendment claim. Adams simply failed to take advantage of the procedures provided under Louisiana law to preserve his Fourth Amendment claim for merits review to the satisfaction of the state courts under state law. His failure to do so, however, does not suffice to overcome the Stone bar to this federal court's review. Moreno, 450 F.3d at 167 (claim that defendant was denied meaningful appeal and that state court erred in deciding appeal of his Fourth Amendment claim was not sufficient to overcome bar to review of his Fourth Amendment claim). "[I]t is the existence of state processes allowing an opportunity for full and fair litigation of fourth amendment claims, rather than a defendant's use of those processes, that serves the policies underlying the exclusionary rule and bars federal habeas corpus consideration of claims under Stone." Williams, 609 F.2d at 220.

In addition, even if the state courts erred in their disposition of the Fourth Amendment claim on procedural grounds, the Stone bar still applies "with equal force" because Adams has not shown that Louisiana's processes or procedural rules are routinely and systematically applied to prevent adjudication of Fourth Amendment

claims.  Williams, 609 F.2d at 220.  This court's review of Adams's Fourth Amendment claim is barred by Stone.  Adams's first two claims must be dismissed for this reason.

V.     STANDARDS OF MERITS REVIEW OF REMAINING CLAIMS

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings.  Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)), cert. denied, 532 U.S. 1039 (2001).  The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'"  Penry v. Johnson, 215 F.3d 504, 507 (5th Cir. 2000) (quoting Miller v. Johnson, 200 F.3d 274, 280-81 (5th Cir.), cert. denied, 531 U.S.

22

849 (2000)), aff'd in part, rev'd in part on other grounds, 532 U.S. 782 (2001); Hill, 210

F.3d at 485.  The United States Supreme Court has clarified the Section 2254(d)(1)

standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> Court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000);  Penry, 532 U.S. at 792-93;

Hill, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the state court decision applied [a

Supreme Court case] incorrectly.'"  Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting

Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)) (brackets in original); Bell v. Cone,

535 U.S. 685, 699 (2002).  Rather, under the "unreasonable application" standard, "the

only question for a federal habeas court is whether the state court's determination is

objectively unreasonable."  Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert.

denied, sub nom, Neal v. Epps, 537 U.S. 1104 (2003). The burden is on the petitioner to

show that the state court applied the precedent to the facts of his case in an objectively

unreasonable manner.  Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25);

Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

VI.     SUFFICIENCY OF THE EVIDENCE (CLAIM NO. 3)

Adams argues that the evidence was insufficient to support the conviction for manslaughter.  He argues that the evidence showed that his father's death was the result of an accident, which he asserts was recognized by the Louisiana Fifth Circuit on appeal. He contends that the evidence established that reasonable hypotheses of the cause of his father's injuries and death could be drawn from the evidence and which would support a finding that the death was accidental rather than caused by an intentional injury.  He further contends that the evidence failed to establish beyond a reasonable doubt that Adams's failure to pursue care for his father's known injuries amounted to a homicide as an element of manslaughter.

These arguments were asserted on direct appeal in the Louisiana Fifth Circuit and were denied as meritless.  Relying on the well-established standard of <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), and related state case law, the appellate court addressed the elements of manslaughter and cruelty to the infirmed, and found that the evidence was more than sufficient to support the manslaughter verdict.  This was the last reasoned state court decision on the issue.

<u>Jackson</u> is the appropriate United States Supreme Court standard for consideration of a claim of insufficient evidence.  Under <u>Jackson</u>, this court must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational

24

trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.  Id., 443 U.S. at 319; Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008); Williams v. Cain, 408 F. App'x 817, 821 (5th Cir. 2011).  Thus, to determine whether the commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law.  Perez, 529 F.3d at 594 (citing Jackson, 443 U. S. at 324 n.16). The court's consideration of the sufficiency of the evidence extends only to what was presented at trial.  See McDaniel v. Brown, 558 U.S. 120, 131, 134 (2010) (recognizing that a reviewing court is to consider the all of the trial evidence as a whole under Jackson); Johnson v. Cain, 347 F. App'x 89, 91 (5th Cir. 2009) (Jackson standard relies "upon the record evidence adduced at the trial.") (quoting Jackson, 443 U.S. at 324).

Review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury.  United States v. Young, 107 F. App'x 442, 443 (5th Cir. 2004) (citing United States v. Garcia, 995 F.2d 556, 561 (5th Cir. 1993); see Jackson, 443 U.S. at 319 (it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").  A reviewing federal habeas court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in

place of the fact-finder.  Weeks v. Scott, 55 F.3d 1059, 1062 (5th Cir. 1995); Alexander v. McCotter, 775 F.2d 595, 598 (5th Cir. 1985).  Thus, all credibility choices and conflicting inferences must be resolved in favor of the verdict.  Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005).  In addition, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'"  Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)).

A claim of insufficient evidence presents a mixed question of law and fact.  Perez, 529 F.3d at 594; Maes v. Thomas, 46 F.3d 979, 988 (10th Cir. 1995).  Therefore, this court must examine whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent as outlined in Jackson.

Though indicted for second degree murder, the jury found Adams guilty of the lesser offense of manslaughter.[22]  Louisiana law defines manslaughter, in relevant part, as follows:[23]

> (1)   A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by

---

[22]Under Louisiana law, manslaughter is a legislatively authorized responsive verdict for a charge of second degree murder. La. Code Crim. P. art. 814(A)(3).

[23]The relevant portion of the statute was determined based on the charge given to the jury by the state trial court.  St. Rec. Vol. 6 of 14, Trial Transcript, pp. 95-96, 9/25/09.

provocation sufficient to deprive an average person of his self-control and
cool reflection.  Provocation shall not reduce a homicide to manslaughter
if the jury finds that the offender's blood had actually cooled, or that an
average person's blood would have cooled, at the time the offense was
committed; or

(2)   A homicide committed, without any intent to cause death or great
bodily harm.

(a)   When the offender is engaged in the perpetration or attempted
perpetration of any felony not enumerated in Article 30 or 30.1, or of any
intentional misdemeanor directly affecting the person . . .

La. Rev. Stat. §14:31(A)(1) (emphasis added); State v. Logan, 34 So.3d 528 (La. App.

2d Cir. 2010); State v. Quiambao, 833 So.2d 1103 (La. App. 2d Cir. 2002).

Under the first provision, "'[s]udden passion' and 'heat of blood' are not elements

of the offense of manslaughter; rather, they are mitigatory factors in the nature of a

defense which exhibit a degree of culpability less than that present when the homicide

is committed without them."  State v. Logan, 34 So.3d at 535 (citing State v. Lombard,

486 So.2d 106 (La. 1986)); State v. Laird, 30 So.3d 1167 (La. App. 3rd Cir. 2010).  Thus,

in Louisiana, it is the defendant's burden to prove by a preponderance of the evidence

that he acted in "sudden passion" or "heat of blood" for a verdict of manslaughter to be

appropriate.  State v. Robinson, 754 So.2d 311 (La. App. 2d Cir. 2000).

As to the second provision of the definition of manslaughter, unintentional

homicide, the relevant misdemeanors referred to in Subsection (2)(a) of the Louisiana

statute in Adams's case were the commission or attempted commission of cruelty to the

infirmed under La. Rev. Stat. § 14:93.3(A) or simple battery under La. Rev. Stat. §

14:35.[24]  Louisiana law defines cruelty to the infirmed as "the intentional or criminally negligent mistreatment or neglect by any person, including a caregiver, whereby unjustifiable pain, malnourishment, or suffering is caused to the infirmed, a disabled adult, or an aged person, including but not limited to a person who is a resident of a nursing home, mental retardation facility, mental health facility, hospital, or other residential facility."  La. Rev. Stat. § 14:93.3(A).  An aged person is anyone sixty (60) years or older.  La. Rev. Stat. § 14:93.3(C).  A caregiver is defined by the statute itself as "any person or persons who temporarily or permanently is responsible for the care of the infirmed, physically or mentally disabled adult, or aged person, whether such care is voluntarily assumed or is assigned."  La. Rev. Stat. § 14:93.3(B).  The statutes include as caregivers adult children who care for or reside with an aged or infirmed person or disabled adult.  Id.

The Louisiana courts recognize criminal negligence within this statute to be a "gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.  It calls for substantially more than the ordinary lack of care which may be the basis of tort liability and furnishes a more explicit statement of that lack of care, which has been variously characterized in criminal statutes as 'gross negligence' and 'recklessness.'"  State v. Booker, 968 So.2d 1190, 1195 (La.

---

[24]St. Rec. Vol. 6 of 14, Trial Transcript, p. 96, 9/25/09.

App. 2d Cir. 2007) (citing State v. Brenner, 486 So.2d 101, 103-04 (La. 1986)). "Unjustifiable pain and suffering" within the meaning of this provision "is a term of limitation intended to distinguish that pain and suffering which is an inevitable consequence of care and treatment from that which is not justified by medical needs." State v. Echeverria, 858 So.2d 632, 635 (La. App. 1st Cir. 2003).

A simple battery, also referenced in the statute, is defined as "a battery committed without the consent of the victim," with the battery itself being "the intentional use of force or violence upon the person of another."  La. Rev. Stat. § 14:35, § 14:33; State v. Harrison, 957 So.2d 199, 202 (La. App. 5th Cir. 2007).  The "attempt" element, which does not appear relevant here, is defined by La. Rev. Stat. § 14:27 which provides in pertinent part that "[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object."

Specific intent to kill, however, is not necessary for a manslaughter conviction. State v. Hutcherson, 785 So.2d 140 (La. App. 2d Cir. 2001); State v. Jones, 4 So.3d 950 (La. App. 2d Cir. 2009).  Similarly, the phrase "intentional" used in the definition of cruelty to the infirmed refers to a "general criminal intent" to mistreat and does not require a specific criminal intent to cause unjustifiable pain and suffering. La. Rev. Stat. § 14:11; Echeverria, 858 So.2d at 635; State v. Stuckey, No. 2011-KA-2327, 2012 WL

29

2061521, at *3 (La. App. 1st Cir. 2012).  Under Louisiana law, general criminal intent is present "whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act."  La. Rev. Stat. § 14:10(2).  Determination of whether the requisite intent is present in a criminal case is for the trier of fact.  State v. Huizar, 414 So.2d 741 (La. 1982).

Thus, in order to convict Adams of manslaughter, the State must have proven beyond a reasonable doubt that (1) Adams killed his father while acting with sudden passion or in the heat of blood, which was immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection, or (2) Adams killed his father without any intent to cause death or great bodily harm (a) when, while acting as his caregiver, Adams intentionally or through criminal negligence or neglect did or attempted to mistreat or neglect his father where unjustifiable pain, malnourishment, or suffering was caused, or (b) when he intentionally used or attempted to use force or violence upon his father without his father's consent.

Adams's argument that the evidence did not establish more than an accident does not preclude a verdict of manslaughter by a caregiver if the jury was convinced beyond a reasonable doubt that Adams killed his father by his intentional or criminally negligent

behavior and mistreatment, which caused his father unjustified pain, suffering or malnutrition.

Adams also has argued that the circumstantial evidence could have allowed for other plausible causes for his father's death, including accidental death caused by Leroy Adams's own fall and/or Adams's accidental fall onto his father as he placed his father into bed after the fall.  In Louisiana, "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."  La. Rev. Stat. § 15:438.  On federal habeas corpus review, however, the court does not apply state law "reasonable hypothesis" standards, but must apply the federal standard announced in Jackson in a manner consistent with the AEDPA standard of review set forth above.[25]  Gilley, 968 F.2d at 467 (citing Schrader v. Whitley, 904 F.2d 282, 284 (5th Cir. 1990)).

For the following reasons, the state court transcripts and overall record support the state courts' findings under Jackson that the evidence was sufficient to support the manslaughter verdict.

_____

[25]Louisiana's circumstantial evidence rule, "is not a purely separate test from the Jackson standard to be applied instead of a sufficiency of the evidence test. ... Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt." State v. Porretto, 468 So. 2d 1142, 1146 (La. 1985); accord State v. Williams, 693 So. 2d 204, 208 (La. App. 4th Cir. 1997). The reasonable hypothesis standard is "just an evidentiary guide for the jury. If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis fails." State v. Maxie, 614 So. 2d 1318, 1321 (La. App. 3d Cir. 1993); accord State v. Williams, 693 So. 2d at 208.

At trial, the jury heard testimony establishing that Lon Adams took over the care and lodging of his 79-year-old father, Leroy Adams Sr., after the elder Adams's home was destroyed during Hurricane Katrina in late August 2005.[26]  At a family gathering on December 25, 2005, Adams's sister, Lynn Landreneau, noticed a mental and physical decline in her father.[27]  On that same day, Adams's mentally disabled adult son, Chad, told his cousin that Leroy Adams would beat on the walls of his bedroom with a cane screaming for someone to bring him food and water.[28]

After that family event, Adams refused to allow Landreneau to speak with or visit her father and declined invitations for their father to visit the Landreneau home, stating that Leroy Adams Sr. was angry with his daughter.[29]  Around that same time, Adams began falsely telling his son Chad that Leroy Adams Sr. was sick and in the hospital.[30] During mid to late 2006, Adams's neighbors noticed flies in the window of the room where Leroy Adams's skeletal remains were later found.[31]  They believed the flies had

---

[26]St. Rec. Vol. 4 of 14, Trial Transcript, p. 42 (Lynn Landreneau), 9/22/99.

[27]Id., pp. 45-46 (Landreneau).

[28]St. Rec. Vol. 5 of 14, Trial Transcript, p. 102 (Chad Adams), 9/23/99.  Chad was 32 years old at the time of trial.  Id., p. 106.

[29]St. Rec. Vol. 4 of 14, Trial Transcript, pp. 50-52, 53 (Landreneau), 9/22/99.

[30]St. Rec. Vol. 5 of 14, Trial Transcript, p. 105 (Chad Adams), 9/23/99.

[31]St. Rec. Vol. 4 of 14, Trial Transcript, pp. 109-110 (Salvador Brocato), p. 119 (Lisa Brocato), 9/22/99.

been attracted by a dead animal, since Adams never repaired his roof after Hurricane Katrina.

On July 26, 2006, Landereneau tried to file a complaint with the Jefferson Parish Sheriff's Office about Adams's refusal to allow anyone to see or speak with her father.[32] The deputies declined to get involved in a family dispute.  When she confronted Adams at his home, he refused to let her and her husband in and falsely told her that their father had been placed in a nearby nursing home.[33]  While at the house, she smelled a horrible odor before Adams closed the door.[34]  After confirming that Leroy Adams was not in the nursing home, as Lon Adams claimed, Landreneau again notified the sheriff's office to no avail.[35]

By June 2, 2008, Landreneau and her husband consulted an attorney, documented their efforts to see her father and notified Louisiana's Elderly Protective Services.[36] Using this information, Landreneau was able to file a missing persons report with the Jefferson Parish Sheriff's Office,[37] which finally responded to her.

---

[32]Id., p. 52 (Landreneau).

[33]Id., p. 53 (Landreneau).

[34]Id., p. 55 (Landreneau).

[35]Id., p. 54 (Landreneau).

[36]Id., p. 56 (Landreneau).

[37]Id., pp. 56-57, 94 (Landreneau).

33

That same day, Lon Adams turned one investigating deputy away and would not allow him into the house.[38]   Sergeant Lisa Lunsford spoke with Landreneau and confirmed through her investigation that Leroy Adams was not incarcerated, hospitalized or known to be dead.[39]   Sergeant Lunsford also contacted Elderly Protective Services to learn that the agency was never able to get Leroy Adams to keep an appointment for its personnel to visit him.[40]

On June 3, 2008, deputies again saw Adams at his home in an attempt to gain consent to enter the house, but the deputies were able to obtain a search warrant to do so without his consent.[41]   Upon entering an upstairs bedroom from which a foul odor emanated, Detective Todd Giacona located what were later determined to be the skeletal remains of Leroy Adams Sr. on top of the bed.[42]   The door to the room had been blocked with debris from holes in the roof and ceiling which had not been repaired after Hurricane Katrina.[43]

---

[38]Id., pp. 125-129 (Deputy Joseph Ventola).

[39]Id., pp. 139, 141, 142,  (Sergeant Lisa Lunsford)

[40]Id., p. 144 (Lunsford).

[41]Id., pp. 145-46, 151 (Lunsford); p. 196 (Deputy David Randall); pp. 201, 203 (Detective Todd Giacona).

[42]Id., pp. 154, 159 (Lunsford); pp. 178-79, 184-85 (Lieutenant Michael Alwert); pp. 203-04 (Giacona); St. Rec. Vol. 11 of 14, Color Photos State's Exhibits, S-9.

[43]Id., p. 157 (Lunsford); pp. 184-85 (Alwert); pp. 204-05 (Giacona); St. Rec. Vol. 11 of 14, Color Photos State's Exhibits, S-8, S-10, S-12 through S-18, S-20, S-21, S-25, S-26.

The jury also heard the tape-recorded statements given by Adams to the sheriff's deputies after discovery of the body.[44] Adams told the deputies that he had not entered his father's bedroom since 2006 and did not know when his father had died.

Adams also recalled in the statements that in late 2005 or early 2006, his father fell out of bed onto an army footlocker and injured his ear and that he fell down the stairs twice. He also often slipped on the wet bathroom floor. Adams said that, when his father fell, he would lift his father up by putting one hand under his father's arm and one under his father's neck, which may have caused the injuries to his father's neck. Adams also told deputies that his father frequently fell out of bed, with the last time occurring in the first quarter of 2006, when he fell onto the footlocker next to the bed. He later recalled that he heard his father fall out of bed in the second quarter of 2006, and he went upstairs to pick him up. That time, Adams picked his father up by putting both hands underneath him and throwing him onto bed. Adams said that he lost his balance and fell on top of his father. Adams told the deputies that he thought his right forearm landed across his father's throat. His father cried out due to severe pain, and seemed to be conscious. Adams simply left him curled up on the bed under the covers and never returned to the room. His father stopped coming downstairs to eat. After a while, Adams knew that his

---

[44]St. Rec. Vol. 5 of 14, Trial Transcript, p. 114 (Lieutenant Don Meunier), 9/23/99; Trial Transcript, pp. 10, 12, 14, 9/24/99. St. Rec. Vol. 11 of 14, Statement of June 3, 8:37 p.m.; Statement of June 12, 2008, 1:15 p.m.; Statement of June 12, 2008, 1:28 p.m.; Statement of June 12, 2008, 2:14 p.m.; Statement of June 12, 2008, 4:55 p.m.; Statement of June 12, 2008, 8:52 p.m. I have compiled the statements for brevity.

father was dead, but it was difficult for him to admit it since he had accidentally hurt his father.  During his statements, he told the deputies several times that he had not adequately cared for his father or sufficiently attended to his father's nutrition and supervision.  He also told the officers that he may not have reported his father's death because he was embarrassed and ashamed and that his father may have died from starvation.

Adams testified at trial in a manner similar to the contents of his pretrial statements, indicating that his father often fell, including two falls down the stairs.[45]  He said his father fell out of bed two or three times a week and from both sides of the bed.[46] He stated that after each fall, Adams would pick his father up by putting his arms under him and he would "get a little momentum and almost toss him" onto the bed.[47]  Adams found it frustrating to watch his father's health decline so rapidly after Hurricane Katrina, and would sometimes fuss at his father to get him to stay in his bed.[48]

Adams testified that the last time he saw his father alive was in the Spring of 2006.[49]  He recalled an incident when he heard his father fall, and he went upstairs to put him back in bed.  When he tried to put his father on the bed, Adams hit the side causing

[45]St. Rec. Vol. 6 of 14, Trial Transcript (continued), p. 190 (Lon Adams), 9/24/99.

[46]Id., 190-91 (Lon Adams).

[47]Id., p. 192 (Lon Adams).

[48]Id., p. 190-91.

[49]Id., p. 193 (Lon Adams).

36

him to drop his father and to fall across his father.  He fell in such a manner that one forearm fell across his father's neck and the other across his father's chest.[50]  He heard his father gasp and let out a small cry in pain.  Adams testified that, at that moment, he realized his father had stopped breathing and had died.  He did not call 911 because he could not admit that he may have killed his father.[51]  He stayed in the room for a while, covered his father and then left the room, never to return.[52]

Adams also conceded at trial that, knowing that his father had a propensity to fall, he left him in the room upstairs and did not provide his father with bed rails or take other protective measures to keep his father from falling out of the bed.[53]  He also took no measures to assure that his father would not trip over or fall onto the footlocker next to the bed.[54]

The testimony at trial concerning forensic and medical findings revealed that Leroy Adams Sr. sustained perimortem, or around the time of death, bone fractures most likely caused by intentional violent blunt force trauma inflicted in one or more events, including two fractures of the hyoid bone, two of the ossified or calcified thyroid cartilage in the neck, one of the xiphoid process or cartilage of the sternum, two of the

---

[50]Id., p. 194, 217 (Lon Adams).

[51]Id., p. 195 (Lon Adams).

[52]Id., p. 196 (Lon Adams).

[53]Id., pp. 201, 206 (Lon Adams).

[54]Id., pp. 192, 202 (Lon Adams).

fingers on the left hand, thirteen of the front and back of the left ribs, eleven to the front and back of the right ribs, one of the eleventh thoracic vertebrae and one of the right big toe.[55]   The medical examinations also revealed antemortem, or before death, injuries to the xiphoid process of the sternum and several left ribs.[56]   These injuries had healed or partially healed before the victim's death.[57]   The medical expert opined that the victim most likely died from injuries and bruising to the organs, including the lungs or kidneys, occurring as a result of the broken rib cage and spine.[58]   The testimony was that the injuries likely caused a painful death that may have occurred within minutes or as long as a few days later, and that it was possible that Leroy Adams Sr. could have survived the injuries if given prompt medical care.[59]

Thus, the jury was presented with testimony and evidence which established that Lon Adams was the caretaker for his father, Leroy Adams Sr., who was over the age of 60.   The evidence also showed that Leroy Adams Sr. died from injuries related to multiple bone fractures in his torso, back and neck so extreme that they most likely were

---

[55]St. Rec. Vol. 2 of 14, Transcript of Direct Examination of Mary Manhein, pp. 15-18, 22, 25, 26-28, 29-31, 32, 41, 42-43, 9/23/09; Transcript of Examination of Dr. Karen Ross, pp. 5, 6-7, 9/23/09; St. Rec. Vol. 5 of 14, Trial Transcript, p. 71 (Ross), 9/23/09; see also, St. Rec. Vol. 5 of 14, Trial Transcript (continued), p. 249 (Detective Keith Locascio), 9/22/09.

[56]Id., pp. 28, 32-34, 37-38 (Manhein).

[57]Id.; St. Rec. Vol. 5 of 14, Trial Transcript, p. 45 (Manhein), 9/23/09.

[58]St. Rec. Vol. 2 of 14, Transcript of Examination of Dr. Karen Ross, pp. 10-11, 16, 9/23/09.

[59]Id., p. 17.

occurred in multiple episodes of violent blunt force trauma. The injuries occurred before and around the time of death and took a tremendous amount of force to fracture or sever the bones as they were found.

Adams admittedly did not properly care for his father. He made no accommodations for his father to avoid his falls down the stairs or out of his bed, in spite of knowing the frequency of the falls. Adams admitted that he did not properly attend to his father's nutrition and supervision and that his father may have died of starvation. Although at trial he indicated that he regularly brought his father meals as he got sicker, his son testified that Leroy Adams Sr. would bang on the walls to get someone to bring him food and water.

Aside from the lack of safety precautions and questionable care and feeding, Adams never took his father for medical attention after the two falls down the stairs or the many falls out of bed. He did not move the furniture or get bed rails to prevent or minimize the falls from the bed. Instead, when his father fell, he would lift his father by the underarms and neck and toss or throw him back on to the bed.

Adams also admitted that on his final visit to his father's bedroom, he hoisted him into the bed after a fall. In doing so, he fell onto his father with one forearm on his father's neck and one on his chest, about where the deadly fractures were found. He knew his father was hurt and had gasped in pain, and he made no effort to call for medical assistance. Instead, concerned that his father may have stopped breathing, he

just stood there in the room for a while, then left the room, never to return. Thus, knowing that his father suffered painful and severe injuries that night, Adams failed to seek medical attention or to ever visit his father's bedroom to confirm his condition, his level of suffering or his fate.

Based on the foregoing, a reasonable jury could easily find that Adams either intentionally injured his father while reacting to the situation and frustration with his father's decline and/or that, without a specific intent to kill or harm him, Adams demonstrated willful if not gross neglect of his father in failing to provide a safe environment, regular meals, and medical attention after his many falls and injuries, including the injuries he knowingly caused and ignored on the last night, resulting in his father's death. A reasonable jury could easily find, based on the trial evidence, that Adams's actions were gross deviations from a reasonable standard of care that caused unjustifiable and severe pain, suffering and perhaps malnutrition.

The jury was well within its authority as factfinder to make credibility determinations regarding when and if Adams or any of the witnesses were truthful and which of the forensic and medical experts to believe.  It is not for this court on federal habeas review to reevaluate witness credibility or the evidence or to substitute its judgment for that of the jury, as Adams now asks the court to do.

Considering the evidence in the light most favorable to the prosecution, it was rational and reasonable for the jury to have found that the essential elements of

40

manslaughter were proven beyond a reasonable doubt.  The state court's denial of relief

on this claim was not contrary to, or an unreasonable application of <u>Jackson</u>.  Adams is

not entitled to relief on this claim.

VII.    <u>EXCESSIVE SENTENCE (CLAIM NO. 4)</u>

Adams contends that the twenty (20) year prison sentence he received is

unconstitutionally excessive as it relates to manslaughter arising from cruelty to the

infirmed.  The Louisiana Fifth Circuit affirmed the sentence on direct appeal and denied

Adams relief on this claim.

Pursuant to Louisiana law, the court considered the nature of the crime, the nature

and background of the offender and the sentence imposed for similar crimes.[60]  The court

noted Dr. Karen Ross's testimony that Leroy Adams's death would have been painful

and not instantaneous and that he may have survived with prompt medical attention.[61]

The court also considered another Louisiana case involving parents as caregivers, who

each received a sentence of twenty-one (21) years at hard labor, which was the maximum

sentence at that time.[62]  The court also took into account that Adams lied to family

members and authorities over the years to hide his father's death.  Considering these

---

[60]<u>State v. Adams</u>, 78 So.3d at 236; St. Rec. Vol. 8 of 14, 5th Cir. Opinion, 10-KA-855, p. 22, 11/15/11.

[61]<u>Id.</u>, 78 So.3d at 237; St. Rec. Vol. 8 of 14, 5th Cir. Opinion, 10-KA-855, p. 23-24, 11/15/11.

[62]<u>Id.</u>, 78 So.3d at 23; St. Rec. Vol. 8 of 14, 5th Cir. Opinion, 10-KA-855, p. 23, 11/15/11.

factors and the trial court's reasons, the state appellate court did not find the sentence excessive.  This was the last reasoned state court opinion on the issue.

For purposes of federal habeas review under the AEDPA standard, an excessive sentence claim presents a question of law.  Chatman v. Miller, No. 05-1481, 2005 WL 3588637, at *5 (E.D. La. Nov. 9, 2005); Davis v. Cain, 44 F. Supp.2d 792, 798 (E.D. La. 1999); Jones v. Kaylo, No. 99-0567, 1999 WL 544680, at *1 (E.D. La. July 26, 1999).  Therefore, this court must determine whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

Federal courts accord broad discretion to a state trial court's sentencing decision that falls within statutory limits.  Haynes v. Butler, 825 F.2d 921, 923-24 (5th Cir. 1987); see Turner v. Cain, 199 F.3d 437, 1999 WL 1067559, at *3 (5th Cir. 1999) (Table, Text in Westlaw) (because sentence was within Louisiana statutory limits and within trial court's discretion, petitioner failed to state cognizable habeas claim for excessive sentence); accord Dennis v. Poppel, 222 F.3d 1245, 1258 (10th Cir. 2000) (citing Haynes, 825 F.2d at 923-24).  If a sentence is within the statutory limits, a federal habeas court will not upset it, unless it is grossly disproportionate to the gravity of the offense. Harmelin v. Michigan, 501 U.S. 957, 1001 (1991); Solem v. Helm, 463 U.S. 277, 291-92 (1983).  "[W]hen a threshold comparison of the crime committed to the sentence imposed leads to an inference of 'gross disproportionality,'" a court will consider (a) the sentences imposed on other criminals in the same jurisdiction and (b) the sentences imposed for

42

commission of the same offense in other jurisdictions.  <u>Smallwood v. Johnson</u>, 73 F.3d

1343, 1347 (5th Cir. 1996) (quoting <u>Harmelin</u>, 501 U.S. at 1005) (citing <u>McGruder v.</u>

<u>Puckett</u>, 954 F.2d 313, 316 (5th Cir. 1992)); <u>United States v. Gray</u>, 455 F. App'x 448,

449 (5th Cir. 2011); <u>United States v. Thomas</u>, 627 F.3d 146, 160 (5th Cir. 2010), <u>cert.</u>

<u>denied</u>, 131 S. Ct. 2470 (2011).

If the sentence is not "grossly disproportionate" in the first instance, however, the

inquiry is finished. <u>United States v. Gonzales</u>, 121 F.3d 928, 942 (5th Cir. 1997),

<u>overruled in part on other grounds</u>, <u>United States v. O'Brien</u>, 560 U.S. 218, __, 130 S.

Ct. 2169, 2180 (2010) (as recognized in <u>United States v. Johnson</u>, 398 F. App'x 964, 968

(5th Cir. 2010)).  As the Supreme Court has noted, successful proportionality challenges

outside the context of capital punishment are "exceedingly rare" and constitutional

violations are sustained in only "extreme" or "extraordinary" cases. <u>Ewing v. California</u>,

538 U.S. 11, 22 (2003) (quotation and citations omitted); <u>Lockyer v. Andrade</u>, 538 U.S.

63, 73, 77 (2003) (quotation and citations omitted).

Louisiana law provides that a person convicted of manslaughter shall be

imprisoned at hard labor for not more than forty (40) years.  La. Rev. Stat. § 14:31.

Adams's sentence of twenty (20) years at hard labor was well within the statutory range

and half of the maximum permissible sentence. Thus, this court will next consider

proportionality when compared with sentences imposed in similar cases.

43

The United States Supreme Court has stated that "'[t]he Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime.'"  Ewing, 538 U.S. at 23 (quoting Harmelin, 501 U.S. at 1001 (Kennedy J., concurring in part and concurring in judgment)).  The Supreme Court has recognized that only the rare case will reach the level of gross disproportionality.  Id., 538 U.S. at 30 (quoting Harmelin, 501 U.S. at 1005).

A survey of the limited number of reported Louisiana decisions establishes that Adams's sentence was the same or less than sentences imposed by Louisiana courts upon caretakers convicted of manslaughter in cases in which a neglected victim suffered a similar death, including some cases involving guilty pleas rather than conviction after trials by jury.  State v. Woods, __ So.3d __, 2013 WL 1977004, at *4 (La. App. 2d Cir. May 15, 2013) (20-year prison sentence after plea to manslaughter not excessive for mother originally charged with second degree murder and who lied to authorities about the circumstances of her child's death where the two-year-old daughter died of asphyxia with multiple blunt force injuries); State v. Givens, 41 So.3d 589, 604 (La. App. 2d Cir. 2010) (37-year prison sentence not excessive for caregiver to 22-month-old child charged with second degree murder found guilty of lesser offense of manslaughter where there was evidence of neglect and mistreatment for months leading to death, and the evidence showed child experienced wheezing, severe pain and suffering for hours before he died

44

from blunt force trauma after being beaten, punched and squeezed and where child had old and new injuries and fractures, collapsed lungs and internal organ damage); State v. Falcon, 26 So.2d 172, 175 (La. App. 2d Cir. 2009) (40-year maximum prison sentence for caregiver to five-month-old child charged with second degree murder who pleaded guilty to manslaughter where the evidence showed numerous injuries and fractures and the defendant had extensive criminal history); State v. Hicks, 968 So.2d 307 (La. App. 2d Cir. 2007) (maximum 40-year prison sentence after plea to manslaughter not excessive for father originally charged with first degree murder for the shaking death of his seven-week-old daughter); State v. Bolden, 501 So.2d 942 (La. App. 2d Cir. 1987) (then-maximum 21-year prison sentence for manslaughter by caretaker not excessive in shaking death of two-year-old victim); State v. Jones, 778 So.2d 1131, 1134 (La. 2001) (20-year sentence after plea to manslaughter not excessive for father who failed to get medical care for 22-month-old daughter whom he knew was repeatedly abused by her mother).

Adams has not shown that his sentence is grossly disproportionate or unconstitutionally excessive under the circumstances of his case or in comparison with other similar cases in Louisiana.  The state courts' denial of relief on this issue was not contrary to established Supreme Court case law, nor was it an unreasonable application of Supreme Court precedent.  Adams is not entitled to relief on this claim.

## RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that Lon Adams's petition for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[63]

New Orleans, Louisiana, this _____18th_____ day of July, 2013.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[63]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.